## THE HENRY S. GROVE.

District Court, D. Maryland. September 22, 1927. .

No. 1413.

1. **Release ⊚⇒17(2)—Successive receipts and releases given by seaman held given under circumstances tending to deceive, and not binding.**

Successive receipts and releases given insurance company by injured seaman *held* to have been given under circumstances such as to deceive seaman, though not so intended, and hence not binding in subsequent libel for injuries.

2. **Contracts ⊚⇒93(2), 99(1)—Generally one signing document is presumed to have read and understood it, and in absence of fraud will not be protected against improvident action.**

Generally speaking, when one signs a document, he is presumed in law to have read and understood its contents, and in the absence of fraud will not be protected against an unwise agreement.

3. **Release ⊚⇒15—Seamen's releases are never conclusive, except when knowingly and understandingly made; doubt being resolved in favor of seamen.**

Releases by seamen are never conclusive, except when knowingly and intentionally made, with full understanding of the situation; doubt being resolved in favor of seaman.

4. **Release ⊚⇒15—Courts should be reluctant to sustain release of liability of which releasing party was ignorant, or which was not in contemplation of parties.**

A court should be slow to hold that a release becomes operative as to a matter of liability of which the releasing party may have been in ignorance, and which was not in the contemplation of the parties when the release was made.

5. **Trade unions ⊚⇒6—Agreement between local longshoremen's union and stevedore companies for compensation insurance, acceptance of which should bar recovery in admiralty for injuries, held not binding on libelant.**

A voluntary agreement between local longshoremen's union and stevedore companies, pursuant to which such companies obtained compensation insurance for members of union on the understanding that they were not required to accept it, but that, if they did, it was a total bar to any recovery in admiralty, *held* not binding on seamen accepting payments made by insurance company, in view of showing made.

6. **Shipping ⊚⇒84(3½)—Ship held not liable for injuries to stevedore caused by falling hatch cover.**

Ship *held* not liable for injuries to stevedore resulting from fall of hatch covers, which were neither removed nor secured by bolts.

7. **Shipping ⊚⇒84(2)—Shipowner owes stevedores duty of exercising diligence to furnish reasonably safe place to work, reasonably suitable appliances, and warning of latent dangers.**

The owner of a vessel owes stevedores engaged on it the duty of exercising reasonable diligence to furnish a reasonably safe place in which to perform services, as well as appliances reasonably suited to the purpose for which they are customarily used, and the further duty of giving stevedores notice of any latent defects in the ship or appliances. ,

8. **Shipping ⊚⇒86(2¾) Stevedore's injury from falling hatch cover held proximate result of negligence of stevedore company.**

Evidence *held* to show negligence of stevedore company or its employes in failing to remove or properly secure hatch cover, which proximately resulted in injury of stevedore.

9. **Shipping ⊚⇒84(5)—Under statute, contributory negligence of stevedore will not bar, but may diminish, recovery, under doctrine of comparative negligence (Merchant Marine Act 1920, § 33 [46 USCA § 688]; Employers' Liability Act [45 USCA §§ 51–59]).**

Under Merchant Marine Act 1920, § 33 (46 USCA § 688 [Comp. St. § 8337a]), making the federal Employers' Liability Act (45 USCA §§ 51–59 [Comp. St. §§ 8657–8665]) applicable to libel for stevedore's injuries, contributory negligence will not bar recovery, though it may diminish the amount of recovery, under the doctrine of comparative negligence.

10. **Shipping ⊚⇒84(3½)—Absence of tent covers, resulting in failure to remove hatch cover during rainy weather, held no defense to stevedore's libel for injuries.**

In stevedore's libel for injuries from falling of hatch cover, which was not removed because of rainy weather, it is no defense to say that removal of covers was not customary in rainy weather without tent covers, which the respondent stevedore company did not have.

In Admiralty. Libel by John W. Gant against the steamship Henry S. Grove and the Atlantic Coast Shipping Company, Incorporated. Decree for libelant against the last-named defendant only.

Julius F. Sandrock, of Baltimore, Md., for libelant.

William L. Marbury, Sr., Fendall Marbury, and L. Wethered Barroll, all of Baltimore, Md., for Atlantic Coast Shipping Co.

George Forbes and Henry L. Wortche, both of Baltimore, Md., for the Henry S. Grove.

COLEMAN, District Judge. This is a libel for personal injuries suffered by the libelant while working as a stevedore in loading sheet steel, varying in length from 6 to 16 feet, on the steamship Henry S. Grove at one of the Locust Point piers, Baltimore harbor, on September 23, 1925. The libel is against both the ship and the stevedore company. The facts surrounding the accident are these:

Libelant, with several other stevedores in his gang, was in No. 5 hold, shelter deck, receiving the tray or dish as it conveyed the

steel sheets down through the hatch, and removing the loaded tray or dish, attaching in its stead an empty one, which in turn was hoisted and refilled. On the day in question it began to rain, as a result of which the work was carried on with the hatch, which was in three sections, each 9 feet long and 21 feet wide, only partially open; that is, the aft and middle section covers were left on and only the forward one removed, although prior to the rain on the same day the work had been done with all three sections removed.

Two heavy iron king beams running across the hatch, 9 feet apart, divided it into the three equal sections, and these beams, together with intermediate cross-beams and the hatch coamings, formed the supports for the hatch covers, which were heavy boards, some 12 or 13 in number in each section, 9 feet long and 2½ feet wide and 2 inches thick. The beams and coamings were fabricated for bolts to be inserted in them in order to secure the beams, but no bolts were in use at the time; the testimony of the ship and stevedore being that it was both uncommon and unsafe to use the bolts, because the risk of accident was thereby increased by reason of the fact that if, upon ascending, the tray should strike one of the beams thus secured, the added resistance against the winches, booms, and tackle would have the tendency, not merely to dislodge the beams and hatch covers, but to break the boom, causing it to fall through the hatch covers, resulting in greater damage than if merely the beam and hatch cover fell.

What actually happened was that the tray, ascending empty, struck the beam, and one or more of the hatch covers, falling through, struck the libelant on the head and other parts of the body. The tray, which was operated with a bridle made fast at four corners, was 6 feet long and 3½ feet wide; so it had a clearance in the hatch of only 1½ feet fore and aft. The marine surveyor of the port of Baltimore, who testified on behalf of the ship, admitted it was always dangerous to work any hatch with any beams left in it.

The ship defends on the ground, first, that it had nothing to do with the loading operation, that being exclusively under the control of the stevedore company, an independent contractor, which was, therefore, entirely responsible for the condition of the appliances directly contributing to the accident, and that the boom, winches, and tackle, which were supplied by the ship, were in every way in first-class condition; and, second, even if the ship had been at fault, there exists a valid written release running from the libelant to the stevedore company, which also released the ship under the joint tort-feasor theory.

The stevedore company defends, first, on the ground that it has already fully compensated libelant for his injuries, and holds a complete valid release from him; second, that libelant was contributorily negligent; and, third, that several years prior to the accident an agreement had been entered into by the local branch of the International Longshoremen's Association, of which local branch libelant was then, and also at the time of the accident, a member, and by certain stevedore companies, including this respondent, and also by certain insurance companies, including the one which represented this respondent in connection with the release above mentioned; that by this agreement it was understood that, in view of the fact that the Workmen's Compensation Act of Maryland (Code Pub. Gen. Laws 1924, art. 101), as a result of what the Supreme Court of the United States had decided (State of Washington v. Dawson, 264 U. S. 219, 44 S. Ct. 302, 68 L. Ed. 646), was no longer applicable to accidents sustained by stevedores upon the navigable waters of the state, the stevedore companies named were to obtain from the insurance companies policies providing compensation for injuries to the same extent as if the Workmen's Compensation Act applied; and it was further understood that, in case any member of the local branch of the International Longshoremen's Association should be injured in any such accident, he must elect between filing a libel in admiralty to recover for said injury and filing a claim for compensation under said policies; and further that, if he claimed the latter, this would forever bar him from his right to the former.

[1] Because of the rather peculiar circumstances surrounding the release, the court insisted upon hearing the testimony in full before passing upon the effect of the release upon either respondent. The court has now come to the conclusion that the character of the receipts and releases, and the way in which they were taken, were such as to deceive the libelant with respect to the transaction as a whole, even though this was not intended, and that, therefore, to allow the last receipt and release, dated January 19, 1926, to be in bar of any further claim by libelant, would be tantamount to permitting a fraud to be practiced upon him.

[2] The court is not unmindful of the fact that libelant is a man of fair intelligence, able to read and write fairly well, and, generally

speaking, when one signs a document, he is presumed in law to have read and understood its contents, and in the absence of fraud will not be protected. The Annie L. Mulford (D. C.) 107 F. 525. But here we are not dealing simply with one release, but with several. The important thing to note is that there were some 16 separate payments made to the libelant, that four separate receipts and releases were taken, and that each one, whether taken for the weekly payment of $18 or for an accumulated number of weekly payments (all prior to the alleged final release), was nevertheless identical in form with the final release, and recited, as did that release, that it was a complete discharge to the stevedore company from any claim whatsoever arising out of the accident to libelant. If such a system of dealing with laboring men, suffering under inherent handicaps of very limited education, was not actually intended to deceive, it certainly had all the potentialities of deception.

If, as was contended by the insurance agent who made the payments and took the releases each time on behalf of the stevedore company, it was orally explained to the libelant that each of these documents except the last was not final, then it is reasonable to suppose that the final one, representing an aggregate payment of $272.57, would have been marked in some distinctive way, or accompanied by a letter in order to denote its finality. True, there was introduced in evidence a letter in libelant's own handwriting, dated January 16, 1926, in which he speaks of the last accumulative payment which he had received, amounting to $272.57, as intended payment "in full," and that, if paid for two additional days, which he claimed had been erroneously omitted, he would be satisfied. But the fact remains that it is at least doubtful whether libelant understood, or could have understood, under the circumstances, just what he was being paid for, whether for mere loss of time, or for personal injuries, or both, or whether he might still come back and receive more money, upon a showing that he was still unable to work.

[3, 4] Indeed, the court may have been too strict in excluding certain evidence which might have thrown light on this question; but there is sufficient evidence remaining in the record to cast doubt upon the propriety of the insurance company's action. As was said in Riegel v. Higgins (D. C.) 241 F. 718, 722: "Releases by seamen are never conclusive, except when made knowingly and intentionally, and with a full understanding of the situation." This being true, the doubt should be resolved in favor of the libelant. A court should be slow to hold that a release becomes operative as to a matter of liability of which the releasing party may have been in ignorance, and which, in fairly interpreting the document, was not in contemplation of the parties when it was made. Tug Ross Coddington, 1924 A. M. C. 615.

[5] The court, therefore, believing that the release is not a bar to the present action against either the ship or the stevedore company, we must next consider whether the libelant is, nevertheless, barred by virtue of the voluntary agreement entered into by libelant's local longshoremen's union, whereby compensation insurance was provided for union members upon the understanding that they need not elect to accept the same, but that, if they did, it was to be a total bar to any recovery in admiralty.

The court does not believe that the libelant is so barred. There is no written evidence of the basic agreement referred to. The effort is made to bind libelant by virtue of the by-laws of his local, and the membership therein provided for, whereby members agreed to be bound by the vote of a majority of their number. But, even assuming that libelant's local did attempt by formal action of a majority of its members to bind them all to the agreement of the parent organization, the evidence as to which is by no means satisfactory, still the court does not think that libelant could thus be deprived of such a substantive right. An intention so to do will not be presumed. Burke v. Monumental Div. No. 52, B. of L. Engineers (D. C.) 273 F. 707.

It is significant, but not conclusive, that there is a direct conflict in the evidence as to whether the libelant ever had proper notice of the so-called voluntary optional plan. There is no evidence whatsoever of formal action by a legal majority of the local union having been taken. These facts, coupled with all of the surrounding circumstances, lead the court to the conclusion that it would be a stretch of legal principles to bind the libelant under any such arrangement. Courts should frown upon any attempt made by employers of large numbers of laboring men to curtail their legal remedies and shut them off summarily from access to the courts, in the absence of a showing of complete mutuality. Large corporations, and especially insurance companies, are often too prone to take advantage of a situation, difficult even for the technician to understand.

[6] Coming finally to the merits of the con-

troversy, the present situation is almost identical with that in Atlantic Transport Co. v. Imbrovek, 234 U. S. 52, 34 S. Ct. 733, 58 L. Ed. 1208, 51 L. R. A. (N. S.) 1157, and (D. C.) 190 F. 229, and (C. C. A.) 193 F. 1019, in so far as concerns the physical forces that caused the accident. In that case the ship was released, but the stevedore company was found guilty of negligence, because pins or bolts were not in the beam to secure it while a partially open hatch was being operated, under conditions virtually identical with those here, and because the stevedore company failed to sustain the burden of proof that the negligence of fellow servants contributed to the accident.

[7] The owner of a vessel owes to stevedores engaged upon it the duty of exercising reasonable diligence to furnish a reasonably safe place in which to perform services, as well as appliances reasonably suited to the purpose for which they are customarily used; and the owner owes the further duty of giving stevedores notice of any latent dangers in the ship or appliances. The Imbrovek Case, supra; Grays Harbor Stevedore Co. v. Fountain (C. C. A.) 5 F.(2d) 385. In the Imbrovek Case it was proved that, when the ship came into port, the stevedore company took complete charge of the hatches. It uncovered so much of them as it saw fit. If the pins were in and they were not wanted, the stevedores took them out; and vice versa, if they were out, and they wanted them in, they obtained them from the ship and put them in. On these facts, the court held that there was no ground on which to hold the ship, and this ruling is binding in the present case, because the facts are virtually identical. Similarly, in The Noranmore (D. C.) 113 F. 367, where it appeared that the stevedores had the management and direction of the hatches, and opened and closed them as found desirable for the convenient dispatch of the work to be done, Judge Waddill held that no liability arose against the ship.

In the Imbrovek Case, there was no issue of contributory negligence on the part of the libelant. There is some evidence in the present case to the effect that part of libelant's job was to assist in opening and closing the hatches before and after the day's work, and that libelant gave orders when to raise the tray; also that the tray had struck the beam several times before. There is a conflict between the written statements of libelant's gang foreman, given shortly after the accident, and his verbal testimony at the time, respecting just what orders he and his fellow servants had received in regard to removing the hatches. The gang foreman first said that the order, both *before* and after the accident, was not to work unless all sections were off, except in handling small freight; and he later said that this order came only *after* the accident. On the other hand, the weight of the evidence is clear that the stevedore deckman was directly responsible for the raising and lowering of the tray at the proper time, that several of libelant's fellow workers had complained of the existing danger, and that the deckman had wanted to remedy the situation, and had reported it to his foreman, but that the latter refused to do anything. The stevedore ship foreman denied receiving any complaints, and defended on the ground that the operation was a customary one, and so he had permitted it to proceed.

[8, 9] These facts lead to the conclusion that one or more of these various persons were negligent in not completely opening the hatch before starting to load, and that such negligence was the direct cause of the accident. The court is unable to find from the evidence that the libelant was himself contributorily negligent. Even if he had been, under the provisions of the Merchant Marine Act of 1920 (46 USCA § 688; Comp. St. § 8337a), which makes the provisions of the federal Employers' Liability Act (45 USCA §§ 51–59; Comp. St. §§ 8657–8665) applicable to this case, recovery would not be defeated by contributory negligence, although the doctrine of comparative negligence, with resulting diminution in the amount of recovery, would apply as formerly. Nor is it necessary to determine whether the stevedore foremen or deckmen stood in the relation of fellow servants or vice principals to the libelant, because, by virtue of the same act, the fellow servant rule is inapplicable. The Coldwater (D. C.) 12 F.(2d) 321, 1926 A. M. C. 286; International Stevedoring Co. v. Haverty, 272 U. S. 50, 47 S. Ct. 19, 71 L. Ed. 157; The West Cape (C. C. A.) 9 F.(2d) 902, 1926 A. M. C. 544.

[10] The court is not impressed with the argument advanced against the use of pins or bolts, especially when there is uncontradicted evidence that they were put on when the beam was replaced after the accident. Admitting the existence of the custom not to use them, this seems to have been a bad custom. As said by Judge Rose in The Imbrovek Case (D. C.) 190 F. 238: "Even if that [the retention of the beam without bolts] had been frequently done, it would have tended to show that the stevedore [company] had

been fortunate rather than prudent." In addition, no convincing reason has been supplied in the present case for not opening the hatch completely. Clearly, it is not sufficient to say that this is rarely done in rainy weather without tent covers, and that the stevedore company, whose duty it is to supply the same, had no tents in this instance, so it was not done.

The court, therefore, finds the respondent stevedore company, and not the ship, liable for the injuries which libelant suffered. These injuries, however, from the testimony of the doctors, about which there is no dispute, appear not to be of a serious or necessarily permanent character. He appears to have recovered from his primary injury, a blow on the head, except to the possible extent of a weakness in the right arm, due to an atrophy involving one of the muscles of the neck. He is a man 55 years old, suffering from hardening of the arteries and chronic nephritis, infirmities not resulting from the injuries. He was earning, before his injury, from $25 to $30 per week. Under the circumstances, the court believes that an aggregate sum of $1,200, including the compensation payment and the value of the medical treatment he has already received, and which libelant has stated he is willing to have applied upon any recovery allowed him in this suit, is just and reasonable.

Upon ascertainment of the exact value of these medical services, to be added to the amount of compensation already received, the court will sign a decree for the balance of $1,200, after the deduction of these amounts.